No. 2012-1619

# United States Court of Appeals
# For the Federal Circuit

———————

GLOBAL COMMUNICATIONS, INC.,

*Plaintiff-Appellant,*

v.

PDI COMMUNICATIONS, INC., NORTH AMERICAN CABLE EQUIPMENT, INC.,
PERFECTVISION MANUFACTURING, INC., and DSI SYSTEMS, INC.,

*Defendants-Appellees.*

**Appeal From The United States District Court
For The Northern District of Florida
In Case No. 11-CV-0541, Judge Robert L. Hinkle**

## NON-CONFIDENTIAL BRIEF OF DEFENDANTS-APPELLEES

LOUIS TOUTON
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA  90071
(213) 489-3939

GREGORY A. CASTANIAS
JENNIFER L. SWIZE
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
(202) 879-3939

*Attorneys for Defendants-Appellees*

## CERTIFICATE OF INTEREST

Counsel for the appellees certifies the following:

1.    The full name of every party or amicus represented by me is:

> PDI Communications, Inc.
> North American Cable Equipment, Inc.
> PerfectVision Manufacturing, Inc. (doing business as Perfect 10
>     Antenna Company, Perfect 10 Satellite Distributing, and
>     PerfectVision)
> DSI Distributing, Inc. (doing business as DSI Systems, Inc.)

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

> The parties listed above are indemnified by DIRECTV, LLC for purposes of this appeal.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

> None for the parties listed above.  DIRECTV, LLC is wholly owned by DIRECTV Holdings LLC, which is wholly owned by The DIRECTV Group, Inc., which is partly owned by DIRECTV, a publicly traded corporation.  The remainder of The DIRECTV Group, Inc. is owned by Greenlady Corp., which is wholly owned by DTV Entertainment, Inc., which is wholly owned by DIRECTV, the publicly traded corporation previously mentioned.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

> JONES DAY:  Gregory A. Castanias, Jennifer L. Swize, Louis Touton, Kevin G. McBride (no longer with firm), Krista S. Schwartz, J. Jason Williams.

> JUDKINS, SIMPSON, HIGH & SCHULTE:  James P. Judkins, Larry D. Simpson.

# <u>TABLE OF CONTENTS</u>

Pursuant to Federal Circuit Rule 28(d)(1)(B), material subject to protective orders entered by the United States District Court for the Northern District of Florida has been redacted from this brief. Material describing the Defendants' confidential business practices has been omitted from page 3, the text on page 7, and the middle of page 34. Material related to confidential business agreements between Global Communications, Inc. and non-parties DIRECTV, Inc. and The DIRECTV Group, Inc. has been omitted from pages 8–11, the middle of page 15, page 16, pages 21–23, the middle of page 33, the top and bottom of page 34, page 35, the top of page 36, footnote 12 on page 37, and the middle of page 43. Material referring to or quoting material marked as confidential in Global's brief has been omitted from footnote 3 on page 7, the bottom of page 15, page 21, page 26, the top of page 33, the middle of page 36, footnotes 11 and 12 on page 36, the text on page 37, page 39, the top and bottom on page 43, and page 45.

**Page**

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF AUTHORITIES ....................................................................iv

STATEMENT OF RELATED CASES ..................................................... vii

COUNTERSTATEMENT OF THE ISSUE ...............................................1

COUNTERSTATEMENT OF THE CASE ................................................1

    A.    Preliminary Statement .........................................................1

    B.    Procedural History...............................................................2

COUNTERSTATEMENT OF THE FACTS ............................................4

SUMMARY OF ARGUMENT ...............................................................14

STANDARD OF REVIEW ....................................................................17

ARGUMENT .........................................................................................18

I.    THE DISTRICT COURT PROPERLY DETERMINED THAT § 8(a) OF THE 2004 AGREEMENT PREVENTS GLOBAL FROM SUING DIRECTV'S DOWNSTREAM PURCHASERS ........................................18

    A.    Under The Patent-Exhaustion Doctrine, The Authorized Sale Of A Product Exhausts The Patentee's Rights In That Product ........18

    B.    The 2004 Agreement Bars Global's Claims Based On Components The Defendants Bought From DIRECTV ....................21

II.    GLOBAL PROVIDES NO REASON TO UPSET THE DISTRICT
       COURT'S PROPER APPLICATION OF PATENT EXHAUSTION ........26

       A.    *Quanta* and *TransCore* Govern, Not *Monsanto*................................26

       B.    The Provisions In § 8(b) Do Not Restrict The Exhaustive Effect
             Of § 8(a) ...................................................................................28

       C.    Section 8(b) Provides Protections To Third Parties That Are
             Distinct From And Complementary To The Protections Of
             § 8(a).........................................................................................33

       D.    DIRECTV's "Have Made" Rights Are Not Relevant To This
             Appeal........................................................................................37

III.   THE DISTRICT COURT PROPERLY APPLIED PATENT
       EXHAUSTION WITHOUT REFERENCE TO EXTRINSIC
       EVIDENCE REGARDING THE 2004 AGREEMENT ..............................44

CONCLUSION ......................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams v. Burke,*
  84 U.S. (17 Wall.) 453 (1873) ..........................................................19

*American Civil Liberties Union of Florida, Inc. v. Dixie Cnty.,*
  690 F.3d 1244 (11th Cir. 2012) .......................................................17

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) .........................................................................17

*Bloomer v. McQuewan,*
  55 U.S. (14 How.) 539 (1853) ....................................................19, 21

*Bowman v. Monsanto Co.,*
  133 S. Ct. 420 (2012) .......................................................................27

*Brinson v. Raytheon Co.,*
  571 F.3d 1348 (11th Cir. 2009) .......................................................45

*Bryant v. Jones,*
  575 F.3d 1281 (11th Cir. 2009) .......................................................39

*Chapman v. AI Transport,*
  229 F.3d 1012 (11th Cir. 2000) (en banc) ......................................17

*Cheyenne River Sioux Tribe v. United States,*
  806 F.2d 1046 (Fed. Cir. 1986) .......................................................41

*Conopco, Inc. v. May Dep't Stores Co.,*
  46 F.3d 1556 (Fed. Cir. 1994) .........................................................39

*CoreBrace LLC v. Star Seismic LLC,*
  566 F.3d 1069 (Fed. Cir. 2009) ............................................38, 42, 43

*Cyrix Corp. v. Intel Corp.,*
  77 F.3d 1381 (Fed. Cir. 1996) .........................................................44

*Global Commc'ns, Inc. v. DIRECTV, Inc.,*
  No. 4:12-cv-00651-RH-CAS (filed Dec. 20, 2012) .........................41

*Grant Cnty. Black Sands Irrigation Dist. v. U.S. Bureau of Reclamation*,
 579 F.3d 1345 (Fed. Cir. 2009) .........................................................39

*Green v. Life & Health Ins. of Am.*,
 704 So. 2d 1386 (Fla. 1998) ........................................................42, 46

*In re MSTG, Inc.*,
 675 F.3d 1337 (Fed. Cir. 2012) .........................................................41

*Jones v. Fla. Ins. Guar. Ass'n*,
 908 So. 2d 435 (Fla. 2005) (per curiam) ..........................................42

*Lexion Medical, LLC v. Northgate Techs., Inc.*,
 641 F.3d 1352 (Fed. Cir. 2011) .........................................................17

*Marine Polymer Techs., Inc. v. HemCon, Inc.*,
 672 F.3d 1350 (Fed. Cir. 2012) (en banc) .........................................38

*Monsanto Co. v. Bowman*,
 657 F.3d 1341 (Fed. Cir. 2011),
 *cert. granted*, 133 S. Ct. 420 (2012) ....................................15, 26, 27

*Princo Corp. v. Int'l Trade Comm'n*,
 616 F.3d 1318 (Fed. Cir. 2010) (en banc),
 *cert. denied*, 131 S. Ct. 2480 (2011) ................................................20

*Pyles v. MSPB*,
 45 F.3d 411 (Fed. Cir. 1995) .............................................................41

*Quanta Computer, Inc. v. LG Electronics, Inc.*,
 553 U.S. 617 (2008).................................................................*passim*

*Resolution Trust Corp. v. Dunmar Corp.*,
 43 F.3d 587 (11th Cir. 1995) (en banc) ............................................45

*Riverwood Int'l Corp. v. R.A. Jones & Co.*,
 324 F.3d 1346 (Fed. Cir. 2003) .........................................................38

*Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*,
 10 F.3d 1563 (11th Cir. 1994) .....................................................38, 39

*Tessera, Inc. v. Int'l Trade Comm'n*,
  646 F.3d 1357 (Fed. Cir. 2011),
  *cert. denied*, 132 S. Ct. 2707 (2012) .......................................................... 20, 40

*TransCore, LP v. Electronic Transaction Consultants Corp.*,
  563 F.3d 1271 (Fed. Cir. 2009) ................................................................ *passim*

*United States v. Univis Lens Co.*,
  316 U.S. 241 (1942) ................................................................................ *passim*

## STATUTES

35 U.S.C. § 154(a)(1) ................................................................................. 18

35 U.S.C. § 271(a) .................................................................................... 18

## OTHER AUTHORITIES

CHISUM ON PATENTS § 16:03(2)(a)(ii) ......................................................... 38

Fed. Cir. R. 34 ......................................................................................... 26

Fed. R. Civ. P. 56 ............................................................................... 17, 44

Fed. R. Civ. P. 59 ................................................................................ 3, 38

## STATEMENT OF RELATED CASES

There is and has been no other appeal in this case.  In addition, the Defendants are not aware of any case that will directly affect, or be directly affected by, the Court's decision in this case.

Since noticing its appeal, Global Communications, Inc. ("Global") has filed a complaint against The DIRECTV Group, Inc. and DIRECTV, Inc. for alleged infringement of the same patents asserted in this case and for breach of contract of the same agreement between DIRECTV and Global at issue in this case.  *See Global Commc'ns, Inc. v. DIRECTV, Inc.*, No. 4:12-cv-00651-RH-CAS (N.D. Fla. filed Dec. 20, 2012).  The issues necessary to this appeal are not raised in that case. However, because Global has raised arguments in its opening brief in this appeal that are not relevant here but may be related to issues in that pending case, the Defendants identify that case here.

## COUNTERSTATEMENT OF THE ISSUE

Did the district court correctly hold that Global exhausted its right to assert infringement against the Defendants based on components sold to them by non-party DIRECTV, where, in a prior settlement with DIRECTV, Global authorized DIRECTV to make such sales?

## COUNTERSTATEMENT OF THE CASE

### A.    Preliminary Statement

In a straightforward application of two longstanding legal principles to the undisputed facts of this case, the district court properly granted a declaratory judgment that defendants PDI Communications, Inc. ("PDI"), North American Cable Equipment, Inc. ("NACE"), PerfectVision Manufacturing, Inc. ("PerfectVision"), and DSI Distributing, Inc. ("DSI") (collectively, "the Defendants") are not liable for infringement based on components they purchased from DIRECTV.  *First*, the court recognized that, under the doctrine of patent exhaustion, the authorized sale of an item exhausts all patent rights in that item, preventing the patentee from asserting infringement against downstream purchasers.  *Second*, the court recognized that a "covenant not to sue" authorizes sales for purposes of the patent-exhaustion doctrine just as much as a "license to sell" does.

Bearing these principles in mind, the proper disposition of this appeal becomes straightforward.  In 2004, Global covenanted not to sue DIRECTV for

any infringement of the patents-in-suit.  That covenant authorized DIRECTV to sell the components in question.  DIRECTV sold those components to the Defendants.  As a result, Global is barred from asserting infringement against the Defendants based on the components they purchased from DIRECTV, which are the only components at issue in this appeal.  The court was correct to so hold, and its judgment should be affirmed.

### B.    Procedural History

On October 21, 2011, Global sued the four Defendants for infringement.  Its complaint, amended January 30, 2012, asserted infringement of eight patents:  U.S. Patent Nos. 5,805,975; 6,122,482; 6,334,045; 6,397,038; 6,947,702; 7,542,717; 7,826,791; and 8,095,064.  (JA151–71; JA465.1–.3; JA466–87.)  The Defendants each denied infringement, raised various defenses, and filed several counterclaims. (JA369–405; JA646–83 (PDI); JA331–68; JA684–720 (NACE); JA406–43; JA608–45 (PerfectVision); JA293–330; JA646–83 (DSI).)  As relevant here, each Defendant filed a counterclaim for a declaratory judgment that Global had exhausted its right to assert infringement based on any product the Defendant had purchased from DIRECTV.  (JA397–99; JA749–51 (PDI); JA360–62; JA712–15 (NACE); JA435–37; JA637–39 (PerfectVision); JA322–24; JA675–77 (DSI).)

On January 27, 2012, the Defendants jointly moved for summary judgment on their patent-exhaustion counterclaims.  (JA460–62; JA480–81; JA490–606.)  In

CONFIDENTIAL MATERIAL DELETED

its initial response, Global sought additional time to conduct discovery. (JA951–57.) The district court allowed that opportunity, and Global thereafter took depositions of each of the four Defendants. (JA1009–10; JA1017 n.1.) When Global ultimately responded on the merits, however, it did not cite any of those depositions, and instead relied upon only a declaration from its president and a declaration supplied by DIRECTV describing DIRECTV's supply chain. (JA1016.1–.4.)

After a hearing (JA1065–1132), the district court on May 21, 2012, granted summary judgment to the Defendants, concluding that Global had exhausted its right to assert infringement against the Defendants for any components they purchased from DIRECTV. (JA1–7.) Thereafter, the court denied Global's motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e), which the court construed as a motion for reconsideration because other claims remained pending and thus final judgment had not yet been entered. (JA8–9; JA1136–43.)

The district court's summary-judgment ruling largely resolved the case

████████████████████████████████████████████

████████. To permit Global's immediate appellate review of the court's ruling, the parties agreed to dismiss the remainder of their claims and counterclaims. In particular, Global agreed to dismiss with prejudice its

infringement claims based on components purchased from sources other than DIRECTV, and the Defendants agreed to dismiss without prejudice their other counterclaims. (JA1154.) On July 6, 2012, the parties asked the court to enter judgment to that effect (JA1153–63), and on July 12, 2012, the court granted the parties' request and dismissed the remaining claims, entering final judgment the next day (JA10–12). On August 13, 2012, Global appealed. (JA1164–65.) As Global concedes, the only components at issue on appeal are components the Defendants purchased from DIRECTV. (Global Br. 10.)

## COUNTERSTATEMENT OF THE FACTS

**Global and the Patents-in-Suit.** The eight patents-in-suit, which Global calls its "Single Wire Patents," comprise a single family of patents that disclose a particular way of transmitting and receiving multiple blocks of satellite transponder signals over a single coaxial cable or optical fiber so that it is not necessary to transmit each block over a separate cable or fiber. Such technology reduces the number of cables connecting a satellite dish and viewers' televisions. (JA2; JA471–73; JA480–81.)

**The Defendants as Distributors for DIRECTV.** DIRECTV is one of the nation's largest providers of direct broadcast satellite television service. To access DIRECTV service, subscribers must have a receiving system installed in their home or place of business that includes various components such as satellite dishes,

satellite receivers, and cables.  (JA523.)  Third parties manufacture the components, ordinarily using specifications provided by DIRECTV.  DIRECTV does not make, and never has made, any of the components of its satellite receiving systems itself. (JA1016.4.)

DIRECTV has designated the Defendants to distribute components used in the DIRECTV satellite television system, and it has enlisted other companies as dealers or installers, who ultimately install the components into an assembled receiving system at a DIRECTV subscriber's home or business.[1]  (JA587 (PDI); JA591 (NACE); JA595 (PerfectVision); JA583 (DSI).)  The Defendants obtain the components they distribute in two different ways, as shown in the following chart:

---

[1] To be accurate, although not relevant here, sometimes DIRECTV does not use the Defendants' services at all and instead has its own technicians (or those with whom it subcontracts) install components at a subscriber's home or business. (JA1016.3.)



Often, as depicted on the left, DIRECTV purchases a component from the manufacturer, receives it in a DIRECTV warehouse, and later sells it to a Defendant (the "Distributor" in the diagram), who in turn sells it to a dealer or installer, ultimately for installation at a subscriber's location.[2]  (JA587–88 (PDI); JA591 (NACE); JA595–96 (PerfectVision); JA583 (DSI); (JA1016.3–.4.)  In other

---

[2] DIRECTV draws from the same purchased components, stored in the same DIRECTV warehouses, when it (or one of its subcontractors) installs the components.

CONFIDENTIAL MATERIAL DELETED

instances, as depicted on the right, a Defendant buys a component directly from the

manufacturer. ██████████████████████  This appeal concerns only those

components the Defendants purchase from DIRECTV—the illustration on the left.

(Global Br. 10.)  The components the Defendants obtain from sources other than

DIRECTV—the illustration on the right—are no longer subject to Global's

infringement charges because those allegations were dismissed with prejudice.[3]

(JA12.)

    **Global's 2004 and 2007 Agreements with DIRECTV.**  The district court's

grant of summary judgment to the Defendants turned on a 2004 settlement

agreement between Global and DIRECTV (the "2004 Agreement").  The

Agreement arose out of Global's 2004 lawsuit against DIRECTV, alleging that

DIRECTV had infringed U.S. Patent No. 5,073,930 ("the '930 patent"), which is

---

[3] Although Global uses various terms to describe the Defendants, their only role relevant to this appeal is that they purchase components from DIRECTV.  For the sake of accuracy, however, the Defendants note that some of Global's terms are not even correct.  For instance, the Defendants ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████  Global also refers to the Defendants as "Master System Operators," but without defining that term.  (Global Br. 4.)  Although the Defendants have sometimes described themselves as "Master System Operators" within their understanding of that term (JA370 (PDI); JA332 (NACE); JA407 (PerfectVision); JA294 (DSI)), that term has not been mutually or judicially defined.  In any event, because these terms are not relevant to the Defendants' role as distributors of components obtained from DIRECTV—their only role relevant to this appeal—the Defendants refer to themselves here simply as "the Defendants" or "distributors."

CONFIDENTIAL MATERIAL DELETED

not a "Single Wire Patent."  (JA529.)  The 2004 Agreement settled the '930 patent

litigation and also provided DIRECTV and its suppliers, distributors, and

subscribers various rights under both the '930 patent and the Single Wire Patents.

(JA530, § 1(d); JA539.)  As compensation, DIRECTV paid Global "a substantial

lump-sum payment" ▮▮▮▮▮▮.  (JA2; JA530, § 2.)

CONFIDENTIAL MATERIAL DELETED



CONFIDENTIAL MATERIAL DELETED



Global further agreed that

In fact, in 2007, ███████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████ (the "2007 Agreement").

(JA547–52.)  In the 2007 Agreement, DIRECTV and Global agreed ████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████

**Global's Lawsuit against the Defendants.**  In this lawsuit, which Global

filed solely against the Defendants and not against DIRECTV, Global seeks

damages from the Defendants and injunctive relief for their alleged infringement of

the Single Wire Patents since 2008.  (JA481–85.)  According to Global, although

the 2007 Agreement precluded it from asserting infringement for the Defendants'

activities through the end of 2007, it was not precluded from suing them for any

activities thereafter.  (JA479–81.)  Global contended that the Defendants have

directly or indirectly infringed the Single Wire Patents since 2008 by re-selling

DIRECTV components to dealers or installers and providing related services for the components.  (*Id.*)

**The District Court's Decision Holding that Patent Exhaustion Precludes Infringement Liability Based on Components Purchased from DIRECTV.**

The district court granted the Defendants' motion for summary judgment of patent exhaustion as to all components they purchased from DIRECTV.  In the district court's words, the Defendants had it "exactly right."  (JA4.)  Under *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 625 (2008), "the initial authorized sale of a patented item terminates all patent rights to that item," and under *TransCore, LP v. Electronic Transaction Consultants Corp.*, 563 F.3d 1271, 1274 (Fed. Cir. 2009), a covenant not to sue authorizes sales for purposes of the patent-exhaustion doctrine.  As the district court ruled, § 8(a) means that "[Global] cannot sue [DIRECTV] for infringing the patent[s], period," and because that covenant authorized DIRECTV's sales to the Defendants, it triggered the patent-exhaustion doctrine for components they purchased from DIRECTV.  (JA4; JA6.)

Notably, the court reached this conclusion notwithstanding the parties' disagreement about whether Global and DIRECTV intended to limit the rights of downstream customers.  Global argued that § 8(b) reflected the parties' efforts to "condition" § 8(a) and thereby exclude DIRECTV Supporting Parties from the scope of patent exhaustion.  (JA4.)  The Defendants "disagree[d] that this is what

the settlement agreement said or meant." (*Id.*)  In granting summary judgment, the court "assume[d] without deciding that Global's reading is correct." (*Id.*)  The court ruled, however, that such a contractual attempt to circumvent the exhaustive effect of § 8(a) would in any event be improper under the doctrine of patent exhaustion.  (JA5.)  As the court stated, the doctrine "is a principle of law that limits a patent holder's ability to control downstream sales of a product using a patent, whether or not a first-level buyer willingly agrees to give the patent holder greater control." (*Id.*)  "Indeed, an important purpose of the patent-exhaustion doctrine is to rein in patent holders' unwarranted efforts to extend their patents, even with the consent and cooperation of their first-level buyers." (*Id.*)  Patent exhaustion thus applied regardless of any intent in the Agreement to "control patented equipment beyond the first authorized sale." (*Id.*)  Accordingly, the court held that Global's attempt to obtain infringement damages from the Defendants based on components they purchased from DIRECTV (the "first-level buyer") was improper—Global had already received compensation for those components when it authorized DIRECTV, in § 8(a), to sell components used in practicing the Single Wire Patents.  (JA5–6; *see also* JA1–2 (noting the "valuable consideration" and "substantial lump-sum payment" Global received from DIRECTV).)  Under patent exhaustion, the Defendants were not liable for a second payment to Global.  (JA5–6.)

## SUMMARY OF ARGUMENT

The district court correctly recognized that this case turns on two basic, well-established principles of patent law, and it properly applied those legal principles to the undisputed facts to grant summary judgment of patent exhaustion. *First*, the authorized sale of a patented item exhausts the patent owner's right to assert infringement based on those items. Thus, those who purchase from an authorized seller need not fear a patent owner's later attempt to extract additional compensation for that item through an infringement suit. *Second*, a patent owner's unconditional covenant not to sue a party for infringement, like an unrestricted license to sell, authorizes sales by that party for purposes of patent exhaustion. As a result, those who purchase from a covenantee are protected by the exhaustion doctrine just as if they had purchased from a licensee or the patent owner itself.

The district court correctly held that these clear and longstanding principles resolve this case as a matter of law. In § 8(a) of the 2004 Agreement, Global covenanted that it would never sue DIRECTV for any alleged infringement of the Single Wire Patents. As the court held, that covenant unconditionally authorized DIRECTV to sell items used in practicing the Single Wire Patents, which, by operation of the doctrine of patent exhaustion, protected those who purchase such components from DIRECTV. In other words, the covenant unambiguously protects DIRECTV from any infringement liability and the exhaustion doctrine

- 14 -

CONFIDENTIAL MATERIAL DELETED

then protects parties who buy from DIRECTV.  Thus, because the Defendants

purchased all of the components at issue in their summary-judgment motion from

DIRECTV, the court correctly granted their motion.

Global provides no reason to upset the court's careful application of the

exhaustion doctrine, and its arguments pay no heed to the governing case law.  Of

the three cases relied upon by the district court in its opinion, Global barely

addresses *Quanta* and *TransCore*, and does not even acknowledge *United States v.*

*Univis Lens Co.*, 316 U.S. 241 (1942).  It argues instead that its circumstances are

like those of the patent owner in *Monsanto Co. v. Bowman*, 657 F.3d 1341 (Fed.

Cir. 2011), *cert. granted*, 133 S. Ct. 420 (2012), a case whose unique subject

matter (the progeny seeds of patented seeds) is clearly inapposite to that of the

present case.

Global also argues that the protections for ████████████████

implicitly limit the exhaustive effect of § 8(a), but this argument misunderstands

the court's decision and patent exhaustion.  As the district court assumed *arguendo*,

even if Global were correct that Global and DIRECTV had tried to eliminate patent

exhaustion by imposing various licensing requirements or other "conditions" on

downstream purchasers in § 8(b), patent exhaustion prevents such a contractual

attempt to restrict the rights of such purchasers.  Further, contrary to Global's

contention, ████████████████████████

████████████████████████████████████████████

███████████. Such components include those purchased by Supporting Parties

from sources other than DIRECTV, examples of which were initially at issue in

this case, but were later dismissed with prejudice by stipulation.

Global further argues, for the first time, that exhaustion does not apply

because § 8(a) does not grant DIRECTV so-called "have made" rights, *i.e.*, the

right to authorize DIRECTV's manufacturers to produce for and sell to DIRECTV

components used in practicing the Single Wire Patents. This argument is not

germane to this appeal for two reasons. *First*, the argument is waived because

Global failed to invoke it in opposition to summary judgment. *Second*, the

argument is irrelevant because patent exhaustion turns only on the seller's

authority *to sell*, which Global unambiguously gave to DIRECTV in § 8(a) without

condition as to how DIRECTV acquired the components. Given the irrelevance of

"have made" rights, the Court should be particularly careful not to address it

because Global has raised that issue in a recently filed case against DIRECTV, and

that case remains pending. But if the Court concludes it must reach the "have

made" rights issue, Global is wrong that § 8(a) did not convey "have made" rights.

Section 8(a)'s grant of authority is plainly unqualified and includes "have made"

rights.

Finally, there is no genuine dispute of material fact precluding summary judgment. Both sides agreed before the district court, and agree again on appeal, that § 8(a) is unambiguous. Global simply disputes the proper application of patent exhaustion here.

The district court's judgment was correct and should be affirmed.

## STANDARD OF REVIEW

Consistent with the governing regional law of the Eleventh Circuit, this Court reviews a grant of summary judgment *de novo*. *See, e.g.*, *Lexion Medical, LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1358 (Fed. Cir. 2011); *American Civil Liberties Union of Florida, Inc. v. Dixie Cnty.*, 690 F.3d 1244, 1247 (11th Cir. 2012). Summary judgment is appropriate where there is no genuine issue of material fact. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). To be "material," the fact must "affect[] the outcome of the case," and to present a "genuine" dispute, the evidence must be such that a "reasonable jury [could] return a verdict in [the non-moving party's] favor." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (internal quotation marks and citation omitted).

## ARGUMENT

**I.    THE DISTRICT COURT PROPERLY DETERMINED THAT § 8(a) OF THE 2004 AGREEMENT PREVENTS GLOBAL FROM SUING DIRECTV'S DOWNSTREAM PURCHASERS**

Under § 8(a) of the 2004 Agreement, DIRECTV is fully authorized to sell otherwise infringing products. Pursuant to the patent-exhaustion doctrine, parties such as the Defendants are therefore free from infringement liability for products they purchase from DIRECTV. Accordingly, the district court properly granted summary judgment to the Defendants.

### A.    Under The Patent-Exhaustion Doctrine, The Authorized Sale Of A Product Exhausts The Patentee's Rights In That Product

The Patent Act provides that infringement occurs when someone "makes, uses, offers to sell, or sells any patented invention" during the patent term "without authority." 35 U.S.C. § 271(a); *see also* 35 U.S.C. § 154(a)(1) (granting patent owners "the right to exclude others from making, using, offering for sale, or selling the invention"). Thus, where the patent owner has authorized the sale of a product practicing its patent, the seller is free from infringement liability. The judicially created doctrine of patent exhaustion, which the Supreme Court has applied for over 150 years, similarly excludes from infringement liability all downstream purchasers of such products. In a recent case reaffirming that doctrine, the Supreme Court explained that the exhaustion doctrine "limit[s] the patent rights that survive the initial authorized sale of a patented item." *Quanta Computer, Inc.*

*v. LG Elecs., Inc.*, 553 U.S. 617, 621 (2008). Specifically, patent exhaustion prevents patent owners from enforcing their patent rights against downstream customers who purchase from an authorized seller (or from the patent owner itself). When an item sold with the patent owner's authorization "passes to the hands of the purchaser, it is no longer within the limits of the [patent] monopoly," and the patent owner may not "seek redress" for infringement. *Bloomer v. McQuewan*, 55 U.S. (14 How.) 539, 549–50 (1853). In other words, "the initial authorized sale of a patented item terminates all patent rights to that item," and the patentee may not seek to control the purchaser's use or resale, or obtain additional payment through an infringement suit. *Quanta*, 553 U.S. at 625.

The patent-exhaustion doctrine serves two key purposes. *First*, the doctrine protects consumers from the negative, anticompetitive consequences of patent rights applying further and further downstream. By "prevent[ing] the patent holder from invoking patent law to control postsale use of the article," the exhaustion doctrine prevents restraints on the free flow of goods once they have entered commerce. *Id.* at 626; *Univis*, 316 U.S. at 252 (after an article has been sold with the patentee's permission, "the patent law affords no basis for restraining the use and enjoyment of the thing sold"); *Adams v. Burke*, 84 U.S. (17 Wall.) 453, 455 (1873) ("the sale by a person who has the full right to make, sell, and use such a machine carries with it the right to the use of that machine to the full extent to

which it can be used"); *Tessera, Inc. v. Int'l Trade Comm'n*, 646 F.3d 1357, 1370 (Fed. Cir. 2011) ("the fundamental purpose of patent exhaustion [is to] prohibit postsale restrictions on the use of a patented article"), *cert. denied*, 132 S. Ct. 2707 (2012). *Second*, to encourage innovation, the doctrine ensures that patent owners are compensated once—but only once—for their patent rights. "[T]he purpose of the patent law [to promote invention] is fulfilled with respect to any particular article when the patentee has received his reward for the use of his invention by the sale of the article." *Univis*, 316 U.S. at 251; *see also Tessera*, 646 F.3d at 1369 ("patent exhaustion is designed to prevent a double recovery"); *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (en banc) (the "theory" behind patent exhaustion is that "the patentee has bargained for, and received, the full value of the [patented] goods"), *cert. denied*, 131 S. Ct. 2480 (2011).

It has long been held that selling a product pursuant to a license constitutes an authorized sale of that product for purposes of patent exhaustion. *See Quanta*, 553 U.S. at 625–28. In *TransCore*, this Court made clear that "an unconditional covenant not to sue authorizes sales by the covenantee for purposes of patent exhaustion" just as much as the grant of a license to sell does. *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1274 (Fed. Cir. 2009). *TransCore* explained that, because no patent "provide[s] the patentee with an affirmative right to practice the patent[,] but merely the right to exclude," "a non-

exclusive patent license is equivalent to a covenant not to sue." *Id.* at 1275 (citing

longstanding precedent in *De Forest Radio Tel. & Tel. Co. v. United States*, 273

U.S. 236, 242 (1927); *Bloomer*, 55 U.S. at 548; and *Leatherman Tool Group Inc. v.*

*Cooper Indus., Inc.*, 131 F.3d 1011, 1015 (Fed. Cir. 1997)).  Thus, it does not

matter whether "an agreement is framed in terms of a 'covenant not to sue' or a

'license'"—"both are properly viewed as 'authorizations.'" *Id.* at 1276.  The

"pertinent question" is whether the agreement authorizes sales or instead

"include[s] a restriction on sales."[6] *Id.*  Because the covenant in *TransCore* was

unconditional—*i.e.*, "without apparent restriction or limitation"—it "authorize[d]

all acts that would otherwise be infringements," including sales, and therefore the

patent owner's rights against downstream purchasers were exhausted.  *Id.* at 1276–

77.

### B.    The 2004 Agreement Bars Global's Claims Based On Components The Defendants Bought From DIRECTV

The district court properly applied patent exhaustion here.  As it ruled, the

§ 8(a) covenant not to sue "authorizes the sale of equipment using the patents—and

---

[6] Global ignores *TransCore*'s holding on this point.  It argues that, under the 2004 Agreement, ██████████████████████████████████████████████ ███████████████████████████████████████████████████  (Global Br. 11.)  *TransCore*, however, specifically held that the difference between licenses and covenants not to sue was "only one of form, not substance" for exhaustion purposes because "both are properly viewed as authorizations."  563 F.3d at 1276. In keeping with *TransCore*'s holding, the Defendants use the terms "license" and "covenant," and "licensee" and "covenantee," interchangeably.

CONFIDENTIAL MATERIAL DELETED

any such sale exhausts the patents." (JA6.) The district court's holding was correct.

The covenant not to sue plainly constitutes an authorization of sales. ██

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ This broad language is without restriction or limitation, and certainly includes no restriction on sales. *See TransCore*, 563 F.3d at 1276.

Indeed, § 8(a) is almost identical to the covenant that unconditionally authorized sales in *TransCore*. There, patent owner TransCore covenanted "not to bring any demand, claim, lawsuit, or action against [covenantee] Mark IV for future infringement of [patented toll collection systems] for the entire remainder of the [patent] terms . . . ." *Id.* at 1273. As this Court ruled, the covenant "unambiguous[ly]" "authorize[d] all acts that would otherwise be infringements: making, using, offering for sale, selling, or importing." *Id.* at 1275, 1276. As a result, the patent-exhaustion doctrine protected from infringement liability the covenantee's downstream purchasers, such as the defendant installer. *Id.* at 1277. Global's § 8(a) covenant not to sue DIRECTV similarly authorized DIRECTV's

sales and shields DIRECTV's downstream purchasers, such as the Defendants, from suit.

Viewing the *TransCore* covenant and § 8(a) side-by-side shows just how indistinguishable they are:

| *TransCore* Covenant (563 F.3d at 1273) | Global Covenant (JA534, § 8(a)) |
|---|---|
| Patent owner "hereby agrees and covenants not to bring any demand, claim, lawsuit, or action against [covenantee] for future infringement of any of [the listed patents], or any foreign counterparts of the aforesaid United States Patents, for the entire remainder of the terms of the respective United States Patents and their foreign counterparts." | |

Just like the covenant in *TransCore*, the broad language in § 8(a) gave DIRECTV the right to engage in all acts that would otherwise be infringing, including sales. The district court agreed, holding that Global "cannot sue [DIRECTV] for infringing the patent[s], period." (JA6.) That authorization to sell triggers patent exhaustion and compels summary judgment, as the district court properly ruled.

Notably, Global has agreed that § 8(a) authorized DIRECTV to sell components used in practicing the Single Wire Patents. As the district court noted, Global "candidly acknowledged that, under the covenant not to sue, Global *cannot* sue DIRECTV." (JA2 (emphasis in original).) For instance, when the court asked

at the summary-judgment hearing about the circumstances under which Global could sue DIRECTV, Global's counsel conceded that DIRECTV "can *never* be a named party . . . under 8(a)." (JA1083 (emphasis added).)  And in response to the Defendants' allegations that "[b]y means of the covenant not to sue, Global, without restriction or limitation, authorized DIRECTV to engage in all acts that would otherwise infringe the Single Wire Patents:  making, using, offering for sale, selling, or importing any claimed invention of the Single Wire Patents," Global "[a]dmitted that the covenant not to sue restricted [its] rights as to DIRECTV." (JA599.)  Having so authorized DIRECTV to sell, Global exhausted its rights to assert infringement based on those components, whether against DIRECTV or its downstream purchasers.

The district court's application of patent exhaustion also comports with the two principal purposes of that doctrine.  *First*, if Global's rights extended downstream beyond an authorized sale, it would be able to improperly restrict the free flow of commerce.  *See Quanta*, 553 U.S. at 626; *Univis*, 316 U.S. at 252 ("when the patentee has received his reward for the use of his invention by the sale of the article," "the patent law affords no basis for restraining the use and enjoyment of the thing sold").  As the district court put it, "an important purpose of the patent-exhaustion doctrine is to rein in patent holders' unwarranted efforts to extend their patents, even with the consent and cooperation of their first-level

buyers," *i.e.*, licensees or covenantees. (JA5.) *Second*, patent exhaustion prevents Global from collecting twice for its patents. DIRECTV has already paid Global for the unconditional right to sell components used in practicing the Single Wire Patents. (JA530, § 2). It would be unfair—and inconsistent with patent law's basic goal of limiting patent monopoly profits to those necessary to promote innovation, *see Univis*, 316 U.S. at 250—to allow Global to recover again from DIRECTV's downstream purchasers.

In short, in light of the straightforward principles of the patent-exhaustion doctrine and its underlying purposes, DIRECTV's undisputed authority to sell components used in practicing the Single Wire Patents resolves this case. Under *Quanta* and *TransCore*, Global's covenant not to sue gave DIRECTV unlimited authority to sell allegedly infringing components, which terminated all patent rights to such items after they were sold. As a result, for every item the Defendants purchased from DIRECTV—that is, for every item at issue in this appeal—Global has exhausted its patent rights. The district court properly held that the 2004 Agreement "terminated Global's patent rights to equipment sold by [DIRECTV]" and barred Global from asserting infringement against the Defendants based on those components. (JA4.)

CONFIDENTIAL MATERIAL DELETED

## II.    GLOBAL PROVIDES NO REASON TO UPSET THE DISTRICT COURT'S PROPER APPLICATION OF PATENT EXHAUSTION

Global's brief does not confront the legal principles making clear that the

district court's judgment should be upheld.  Instead, Global invokes this Court's

inapposite decision in another case, now under Supreme Court review, that

concerned the exhaustion doctrine's application to self-replicating genetically-

modified seeds; tries, without support, to leverage § 8(b) as restricting the

exhaustive effect of § 8(a); ███████████████████████████████

████; and raises a new argument about "have made" rights that is waived,

irrelevant, and in any event based on a faulty premise.[7]

### A.    *Quanta* and *TransCore* Govern, Not *Monsanto*

Remarkably, Global's brief barely even acknowledges the controlling case

law governing the patent-exhaustion issue decided on summary judgment.

Although *Quanta* directly governs and was central to the district court's decision,

Global spends only two sentences discussing it.  (Global Br. 17; *cf.* JA3–5.)

Global never even cites *Univis*, the leading case on patent exhaustion until *Quanta*

and the second of the three cases the district court discussed.  (*See* JA5–6.)

As for *TransCore*, which sets forth the other principle at the heart of the

district court's ruling and is the district court's third cited decision, Global

---

[7] In its brief, Global requests oral argument and asks for twenty minutes for each side.  (Global Br. 10.)  The Defendants believe that the ordinary fifteen minutes per side is sufficient.  *See* Practice Notes to Fed. Cir. R. 34.

addresses it in barely more than a page, ultimately claiming that *TransCore* is now

"suspect" in light of this Court's more recent decision in *Monsanto*, which rejected

a defense of patent exhaustion.  (Global Br. 18–21; *cf.* JA4–6.)  But *Monsanto* is

wholly off point.  There, this Court concluded that the patent owner's rights were

not exhausted as to "new seeds" (the progeny of self-replicating licensed seeds)

that were never the subject of a license and for which the patent owner had

received no compensation.  *Monsanto*, 657 F.3d at 1347–48.  As the Court put it,

invoking patent exhaustion to bar a suit for such newly created, self-replicating

items "would eviscerate the rights of the patent holder."  *Id.* at 1348 (internal

quotation marks and citation omitted).

This case could not be more different.  Unlike seeds, DIRECTV equipment

does not produce copies of itself.  As a result, the DIRECTV components sold and

used by the Defendants are not "new."  They are the exact same ones sold by

DIRECTV to the Defendants and for which Global has already been compensated,

and they are thus precisely within the scope of the patent-exhaustion doctrine.

*Monsanto* says nothing that undermines *TransCore*, much less *Quanta*, and those

decisions' application to this case.[8]

---

[8] Global also failed to inform the Court that the Supreme Court has granted review of the *Monsanto* decision.  *See Bowman v. Monsanto Co.*, 133 S. Ct. 420 (2012) (No. 11-796).  Bowman filed his opening brief on the merits on December 3, 2012, and Monsanto's brief in response is due January 16, 2013.  The Supreme Court will hear oral argument in the case on February 19, 2013.

## B.  The Provisions In § 8(b) Do Not Restrict The Exhaustive Effect Of § 8(a)

Global also tries to "factually distinguish[]" *TransCore* by arguing that, unlike the unconditional covenant given exhaustive effect there, the exhaustive effect of § 8(a) is restricted by § 8(b).  (Global Br. 1, 15–16, 18–20.)  According to Global, in § 8(a) and § 8(b), the 2004 Agreement distinguished between the protections to DIRECTV (and its "Affiliates") and the protections to companies that are DIRECTV Supporting Parties, such as the Defendants.  (Global Br. 1, 14–16, 18.)  Although Global admits that § 8(a) is "unlimited" (Global Br. 21), it asserts that the provisions in § 8(b) restrict § 8(a) by "requiring future licensing" for the Defendants and other DIRECTV Supporting Parties to avoid infringement. (Global Br. 1, 11, 16.)  Stated differently, Global asserts that § 8(a) relates only to DIRECTV (and its Affiliates) and § 8(b) relates only to DIRECTV Supporting Parties, so that § 8(a) has no relevance to DIRECTV Supporting Parties, even for components they purchased from DIRECTV.

As the district court ruled, Global is wrong.  Patent exhaustion "is a principle of law" that prohibits patent owners from authorizing sales but then attempting to restrict downstream purchasers.  (JA5.)  The covenant in § 8(a) authorized DIRECTV to sell, "thus barring an action not only against the covenantee [DIRECTV] but also against the third party," *i.e.*, the Defendants, based on components they purchased from DIRECTV.  (JA1; JA6.)

In reaching its conclusion, the court accepted, for purposes of the summary-judgment motion, Global's view that § 8(a) "did not authorize a third party like [the Defendants] to acquire equipment from DirecTV and resell it without paying a separate royalty," because § 8(b)(2) permits Supporting Parties to obtain their own license, or permits DIRECTV to buy one on their behalf, if they wished to engage in activities that would otherwise constitute infringement for components purchased from DIRECTV.  (JA4.)  The patent-exhaustion doctrine, however, does not depend on the Defendants' rights as DIRECTV Supporting Parties.  Rather, it applies because Global authorized DIRECTV to sell the components at issue.[9] Exhaustion is an inescapable legal consequence of those authorized sales to the Defendants.  As the court explained, regardless of any supposed intent in § 8(b) to limit a Supporting Party's conduct with respect to purchases from DIRECTV, Global and DIRECTV could not "abrogate the doctrine of patent exhaustion."  (JA5.)  Accordingly, even accepting Global's position that § 8(b) was intended to limit the downstream reach of § 8(a), patent exhaustion still applies.  (*See* JA4–5.) As the court put it, "[h]ad Global explicitly licensed DIRECTV to sell equipment using the single-wire patents to the defendant distributors but insisted that the

---

[9] For this reason, Global's argument that the Defendants are not DIRECTV's "Affiliates" is beside the point.  (Global Br. 14–16.)  The basis of the district court's ruling was not that the Defendants are Affiliates, but rather that they purchased from DIRECTV, and were thus immunized by exhaustion.  Exhaustion does not require that such a third party be a party to the license or covenant that produces the exhaustion.

distributors obtain their own licenses before reselling the equipment or installing it," such an arrangement "would plainly run afoul of the patent-exhaustion doctrine." (JA5.)  Global's reading of § 8(b) nonetheless posits the same, improper arrangement.  The court correctly rejected such an attempt to limit the legal consequence of exhaustion triggered by DIRECTV's exercise of its right to sell in § 8(a).

*Quanta* and *TransCore* compelled the court's ruling.  *Quanta* and *TransCore* make clear that, if the patent owner authorized the licensee's or covenantee's sales, any intent to deny protection to downstream purchasers is irrelevant.  In *Quanta*, the license included provisions seeking to limit the authorized uses of downstream purchasers—the license disclaimed any further license to third parties to combine licensee Intel's parts with non-Intel parts.  *See* 553 U.S. at 637.  In addition, another LGE-Intel agreement required Intel to notify its customers of this purported limitation on their authority—notice that downstream-purchaser Quanta received but ignored by combining Intel and non-Intel parts for resale.  *See id.* at 623–24.  LGE argued that, through these provisions, it and Intel had thus restricted downstream purchasers' actions, cutting off the patent-exhaustion doctrine.  *See id.* at 637.

The Supreme Court rejected this argument:  "[T]he question whether third parties received implied licenses is irrelevant because Quanta asserts its right to

practice the patents based not on implied license but on exhaustion. And *exhaustion turns only on Intel's own license to sell products practicing the LGE Patents.*" *Id.* (emphasis added). Because "[n]othing in the [license] restrict[ed] *Intel's right to sell* its [products] to purchasers who intend[ed] to combine them with non-Intel parts," exhaustion applied despite LGE's cited provisions. *Id.* at 636 (emphasis added). In other words, even though LGE and Intel purported to restrict Intel's customers' ability to combine parts, the Court rebuffed those efforts to control downstream purchasers as contrary to the patent-exhaustion doctrine and Intel's unconditional right to sell.

*TransCore* reiterated this point. Affirming the district court's exclusion of parol evidence about the parties' intent with respect to downstream purchasers, this Court noted that "[o]n this point *Quanta* is clear": "The only issue relevant to patent exhaustion is whether [the covenantee's] sales were authorized, not whether [the patent owner and covenantee] intended, expressly or impliedly, for the covenant to extend to [the covenantee's] customers." *TransCore*, 563 F.3d at 1277. Accordingly, proffered evidence that the parties to the covenant intended to cut off downstream purchasers' rights was "irrelevant" and "could not impact the outcome reached." *Id.*

In nonetheless seeking to distinguish the "unconditional" covenant in *TransCore*, Global describes the licensing provisions in § 8(b) as "conditions."

(Global Br. 1, 11; *see also, e.g., id.* at 1 (contending that these "conditions" were supposedly "recognized" by Global and DIRECTV in the 2007 Agreement).)  But as the district court ruled, this "semantic argument" has no merit.  (JA6.)  The only "conditions" that could preclude application of patent exhaustion are ones limiting DIRECTV's authority to sell (such as geographic restrictions on sales).  *See, e.g., TransCore*, 563 F.3d at 1276 (noting no restriction on sales).  Any "conditions" on the rights of downstream purchasers are irrelevant—the patent-exhaustion doctrine rejects contractual attempts to limit the scope of patent exhaustion.  (JA5–6.)  Requiring downstream purchasers to obtain a license in order to avoid infringing the Single Wire Patents is precisely the sort of limitation that is ineffective—a patent owner cannot avoid the exhaustive effect of authorized sales by seeking to restrict the rights of downstream purchasers.  *See Quanta*, 553 U.S. at 636–37; *TransCore*, 563 F.3d at 1277.

In short, under both *Quanta* and *TransCore*, the district court correctly held that even if Global's construction of its agreement with DIRECTV were correct, DIRECTV's right to sell triggers patent exhaustion, and Global and DIRECTV could not contract around the patent-exhaustion doctrine by limiting the rights of downstream purchasers.  (JA4–6.)  Section 8(b) cannot restrict the exhaustive effect of § 8(a).

C.     **Section 8(b) Provides Protections To Third Parties That Are Distinct From And Complementary To The Protections Of § 8(a)**

Global also argues that, if the judgment is upheld, the provisions ██████

████████████████████████████████████████████████████████████████████████

(Global Br. 19; *see also id.* at 21 (charging ████████████████████████

████████████████████████ ).)  Global is wrong here, too.

As the Defendants explained in support of summary judgment, each provision of the 2004 Agreement offered a distinct kind of protection to DIRECTV and those in its supply chain.  The principal provision, § 8(a), ensured that DIRECTV (██████████████) have complete immunity under the Single Wire Patents.  ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ While DIRECTV ██████████████ are the direct beneficiaries of this covenant, it also provides indirect benefits to third parties by operation of law under certain circumstances.  In the present instance, allegedly infringing components that were sold by DIRECTV are subject to the patent-exhaustion doctrine, and so the covenant of § 8(a) effectively immunizes third parties (including the Defendants) who purchase those components from DIRECTV.

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ Such

components were accused of infringement in this action (JA481–84), a fact that

Global acknowledged at the summary-judgment hearing when it stated that "some

[component] transactions [have gone] straight from the DirecTV supporting party

manufacturers to the DirecTV supporting party distributors."[10]  (JA1079–80.)

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

---

[10] In order to proceed with this appeal after the district court's ruling on exhaustion, Global dismissed with prejudice its allegations based on components the Defendants acquired from third-party manufacturers.  (JA11; JA480.)

CONFIDENTIAL MATERIAL DELETED

These provisions address components that are not immunized from suit as a result of DIRECTV's exercise of its rights under § 8(a).

The provisions of § 8(b)(2) have been used by DIRECTV to secure a license for components made by third-party manufacturers and directly sold to distributors. That license is memorialized in the 2007 Agreement. The 2007 Agreement covered components

██████████████████████████████████████████████

████████████████████████████████████████

Though the Defendants advanced this plain-language interpretation of § 8(a), § 8(b), and the 2007 Agreement in the district-court proceedings (*see, e.g.*, JA512–13; JA1060.4–.5 & n.5), Global fails to address it in its opening brief, instead falsely claiming that the Defendants have ███████████████████.[11] (Global Br. 13.)  Global also fails to acknowledge in its brief that the Defendants sometimes purchase their components from sources other than DIRECTV, despite the fact that Global's lawsuit originally included infringement claims based on the Defendants' conduct related to such components.  Finally, Global fails to address the Defendants' explanation that the 2007 Agreement grew out of disputes about components sold by third parties rather than by DIRECTV (JA1125–27), even though Global introduced no evidence to the contrary, as it admitted to the district court (JA1093–1094).[12]  It is Global that is ignoring matters, and by doing so it fails to grasp the plainly dispositive effect of *Quanta* and *TransCore* on this appeal.

_____

[11] Global also claims, without citation, that the district court ███████████ ████████████████████████████████████████████████ (Global Br. 19).  This is not true.  The district court did not determine which side's interpretation of § 8(b) was correct, but rather "assume[d] without deciding" that Global was right and on that assumption concluded that even if Global and DIRECTV meant to restrict downstream purchasers' rights through § 8(b), the patent-exhaustion doctrine prohibited them from doing so.  (JA4; JA5–6.)

[12] At most, Global baldly asserts here that the 2007 Agreement ████████ ██████████████ and "is identical to," the scenario before the Court, *i.e.*,

## D.     DIRECTV's "Have Made" Rights Are Not Relevant To This Appeal

Global, for the first time, raises the novel argument that an alleged absence of "have made" rights negates the exhaustion doctrine. (Global Br. 19–20, 23–25.) But whether DIRECTV has "have made" rights need not be addressed in resolving this appeal because that issue is both waived and irrelevant to the exhaustion doctrine. Furthermore, Global's premise is wrong—DIRECTV has "have made" rights.

According to Global, § 8(a) did not grant DIRECTV rights to have others make components used in practicing the Single Wire Patents ("have made" rights), and so exhaustion does not result from DIRECTV's exercise of its unqualified right to sell such components. Global cites no legal authority for this proposition. Instead, and without any record support, Global resorts to casting aspersions upon DIRECTV, characterizing it as operating an unlawful ██████████████

████████████████████████████████████████████████████████

████████████████████████████ (Global Br. 5, 25.) Global argues that § 8(a) is not "unlimited" because it granted no "have made" rights, and so these

---

(continued…)

components purchased from DIRECTV (Global Br. 6, 24), but again it provides no evidence to support these assertions. They are incorrect. A review of the 2007 Agreement shows that it concerned components ████████████████████

████████████████████████████████████████████████████

components cannot be "cleanse[d]" by patent exhaustion by "pass[ing]" them

through DIRECTV. (Global Br. 6, 19, 25.)

Global's "have made" rights argument need not be addressed in resolving

this appeal for two reasons. *First*, Global has waived the right to oppose patent

exhaustion on the basis of "have made" rights. In the Eleventh Circuit as well as in

this Circuit, "a ground not pressed in the district court in opposition to a motion for

summary judgment is to be treated by the district court as abandoned," and

accordingly abandoned on appeal as well. *Road Sprinkler Fitters Local Union No.*

*669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994); *Marine*

*Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1360 (Fed. Cir. 2012) (en

banc) (a party waives arguments on appeal "by failing to raise [them] in opposing

summary judgment"); *see also Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324

F.3d 1346, 1352 (Fed. Cir. 2003) (regional circuit law applies "to the procedural

question of waiver"). In opposing summary judgment of patent exhaustion, Global

did not challenge DIRECTV's "have made" rights.[13] (*See* JA1017–34.) Even

---

[13] In support of its "have made" argument here, Global refers to arguments it made at the summary-judgment hearing (Global Br. 19), but there Global argued about "foundry" rights, not "have made" rights. (*E.g.*, JA1080–82, 1090–91; JA1140.) These rights are not the same: "Have made" rights allow the recipient to "engage others" to make the patented item for it, *CoreBrace LLC v. Star Seismic LLC*, 566 F.3d 1069, 1073 (Fed. Cir. 2009), whereas foundry rights authorize the recipient to "mak[e] products" for another, CHISUM ON PATENTS § 16:03(2)(a)(ii). DIRECTV does not make products or components, so foundry rights are irrelevant. Only after the district court granted summary judgment did Global, in its Rule

CONFIDENTIAL MATERIAL DELETED

before this Court, Global does not mention "have made" rights in its "Statement of

Issues." (*See* Global Br. 1.) That alone renders the argument waived. *See*

*Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1561 n.1 (Fed. Cir. 1994).

Because Global failed to preserve a challenge based on "have made" rights, that

argument is waived. *See Grant Cnty. Black Sands Irrigation Dist. v. U.S. Bureau*

*of Reclamation*, 579 F.3d 1345, 1362 (Fed. Cir. 2009) ("the appellants have not

squarely presented [the] issue to us, nor did they present it to the district court; it is

therefore not before us, and we do not decide that question").

   *Second*, even if properly raised, "have made" rights are not relevant to the

doctrine of patent exhaustion, which is the only issue before the Court.  Other than

its conclusory assertions, Global itself is not clear how "have made" rights could

be related to patent exhaustion.[14]  Indeed, DIRECTV's "have made" rights are not

relevant.  Global's bar against suing the Defendants for infringement based on

components purchased from DIRECTV turns only on Global's grant of authority to

---

(continued…)

59(e) motion, refer to "have made" rights.  (JA1139 n.4.)  In any event, either time
was too late.  An argument not presented in a party's principal summary-judgment
brief is waived.  *See Road Sprinkler Fitters*, 10 F.3d at 1568; *Bryant v. Jones*, 575
F.3d 1281, 1308 (11th Cir. 2009) (even including an argument in a reply brief for
summary judgment is too late).

   [14] Moreover, although Global's "have made" rights argument ███████
████████████████████████ (Global Br. 24), that characterization is incorrect.
*See supra* note 3.

- 39 -

DIRECTV to sell downstream (for which Global was compensated), not any authority to buy from upstream manufacturers.

As *Quanta* held, "exhaustion turns only on [the licensee's] own license to sell products practicing the . . . [p]atents." 553 U.S. at 637; *id.* at 625 (it is the "initial authorized *sale* of a patented item" that "terminates all patent rights to that item" (emphasis added)); *accord Tessera*, 646 F.3d at 1369 (twice noting *Quanta*'s emphasis on the licensee's "*right to sell*" and "*authority to sell*" (emphasis in *Tessera*)); *TransCore*, 563 F.3d at 1277 ("The only issue relevant to patent exhaustion is whether [the licensee's] sales were authorized"); *id.* at 1276 ("the pertinent question" is whether the agreement "authorize[s] *sales*" (emphasis in original)). Keeping with this focus on sales, *Quanta* rejected the patent owner's efforts to inject into the case portions of the agreement other than the authorization to sell, such as the licensee's obligation to tell customers they could not combine certain parts. 553 U.S. at 637. As the Supreme Court explained, the licensee's authority to sell "was not conditioned on" compliance with those provisions, and they therefore did not matter to the exhaustion analysis. *See id.*; *see also Tessera*, 646 F.3d at 1370 (rather than consider whether other provisions had been satisfied, "[t]he proper focus" of patent exhaustion "is on whether the sales were authorized").

Similarly, DIRECTV's authority to sell under § 8(a) is not conditioned on whether or not the components it sells are acquired from any particular source. Accordingly, DIRECTV's "have made" rights are not pertinent to the summary-judgment ruling on appeal. The Defendants are protected by the patent-exhaustion doctrine regardless whether DIRECTV possesses "have made" rights to the Single Wire Patents.

The Court should be particularly cautious about addressing DIRECTV's "have made" rights because, while not relevant here, Global has raised the issue in another pending case. After filing its opening brief in this appeal, Global brought suit against DIRECTV, alleging that DIRECTV has breached the 2004 Agreement and infringes the Single Wire Patents based on DIRECTV's engagement of "unlicensed third parties to manufacture single wire equipment." *Global Commc'ns, Inc. v. DIRECTV, Inc.*, No. 4:12-cv-00651-RH-CAS (filed Dec. 20, 2012), Dkt. No. 1 ¶¶ 56, 76–108. That issue is not joined here. *See, e.g.*, *In re MSTG, Inc.*, 675 F.3d 1337, 1347 (Fed. Cir. 2012) ("Because the issue is not before us, we reserve [it] for another day"); *Pyles v. MSPB*, 45 F.3d 411, 416 n.4 (Fed. Cir. 1995) ("We of course express no opinion [on the issue], as the issue is not before us or in any way relevant to the issue [actually presented]"); *Cheyenne River Sioux Tribe v. United States*, 806 F.2d 1046, 1051 (Fed. Cir. 1986)

("express[ing] no opinion" on a party's claims because "they [were] not relevant" to the issue before the court).

In the event, however, the Court concludes it must address the issue here, the case law makes clear that the premise of Global's argument is wrong—DIRECTV has "have made" rights. The "right to 'make, use, and sell' a product inherently includes the right to have it made by a third party, absent a clear indication of intent to the contrary"—a presumption that is not easily overcome. *CoreBrace LLC v. Star Seismic LLC*, 566 F.3d 1069, 1072–73 (Fed. Cir. 2009).[15] For instance, the license in *CoreBrace* explicitly granted only the rights to "make, use, and sell," and reserved to the patent owner all rights "not expressly granted." *Id.* at 1074.

_____

[15] Although *CoreBrace* applied Utah law to the state-law issue of whether an agreement conveys "have made" rights, that analysis applies here as well. As *CoreBrace* observed, no Utah decision had addressed the topic; therefore, this Court "determine[d] what decision the state court would make if faced with the same facts and issue" and in doing so applied routine principles of contract interpretation. 566 F.3d at 1073 (internal quotation marks and citation omitted); *see also id.* (quoting Utah cases explaining that Utah courts "look to the plain language" of the contract and "attempt to harmonize" the contract's provisions (internal quotation marks and citation omitted)). Likewise here, although no Florida court has decided whether an unconditional covenant not to sue confers "have made" rights, Florida courts follow the same basic principles of contract interpretation. *See, e.g.*, *Green v. Life & Health Ins. of Am.*, 704 So. 2d 1386, 1391 (Fla. 1998) ("contract language that is unambiguous on its face must be given its plain meaning"); *Jones v. Fla. Ins. Guar. Ass'n*, 908 So. 2d 435, 456 (Fla. 2005) (per curiam) ("courts are required to read provisions of a contract harmoniously to give effect to all portions thereof"). Accordingly, *CoreBrace*'s holding—that an agreement granting the authority to make, use, and sell inherently grants "have made" rights absent a clear indication to the contrary—applies here under Florida law.

Nonetheless, this Court held that the license granted "have made" rights, emphasizing the inherent nature of those rights and the absence of any contractual language explicitly disclaiming them.  *See id.* at 1074–75.  Likewise here, the § 8(a) covenant broadly gave DIRECTV the right to make, use, offer to sell, sell, and import components used in practicing the Single Wire Patents.  *See supra* Section I.B; *see also TransCore*, 563 F.3d at 1276.  Under *CoreBrace*, Global's grant of authority to DIRECTV to engage in any such conduct includes "have made" rights, absent a clear expression of intent to the contrary.  *See* 566 F.3d at 1073–75.  There is no such contrary expression here.  Although Global asserts that ████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████  The covenant and framework for licensing established in ████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████ provide no support for its challenge to DIRECTV's "have made" rights.  (*See* Global Br. 5, 25.)  DIRECTV orders components from third-party manufacturers, and sometimes transfers the components to the Defendants, who distribute the components to others, ultimately for installation at a subscriber's location.  These independent transactions are each

part of DIRECTV's sensible business judgment to operate an efficient, modern supply chain in support of the satellite television service it provides to its subscribers, not a sham attempt to launder illegal equipment. *See Cyrix Corp. v. Intel Corp.*, 77 F.3d 1381, 1387–88 (Fed. Cir. 1996) (licensee and downstream purchaser did not infringe where the licensee lawfully enlisted an otherwise unlicensed third party to manufacture goods for the licensee to sell to the downstream purchaser). Global's attempt to dispute DIRECTV's "have made" rights by casting aspersions on that legitimate supply chain has no basis. But for the reasons already stated, there is no need to address Global's "have made" rights allegations to resolve the patent-exhaustion issue before the Court.

## III. THE DISTRICT COURT PROPERLY APPLIED PATENT EXHAUSTION WITHOUT REFERENCE TO EXTRINSIC EVIDENCE REGARDING THE 2004 AGREEMENT

Global alternately argues that factual disputes preclude summary judgment. (Global Br. 19, 22–23.) This, too, should be rejected. To begin with, even though Global took discovery from all four Defendants and DIRECTV, it never cited to the district court "particular parts of materials in the record" showing a genuine dispute of material fact, which Federal Rule 56(c)(1)(A) requires. It merely attached its president's declaration describing his (irrelevant) subjective intent in entering into the 2004 Agreement, and a declaration from DIRECTV describing its supply chain, which Global does not cite to this Court. (JA1035–39; JA1016.3–.4.)

Indeed, both sides agreed in the district-court proceedings that the language of the 2004 Agreement is unambiguous—the parties merely disagreed on what the unambiguous meaning is. (*E.g.*, JA511 (the Defendants' view); JA1028–29 (Global's).)  Accordingly, the court properly granted summary judgment without reference to any extrinsic evidence of DIRECTV's or Global's contractual intent. *See Brinson v. Raytheon Co.*, 571 F.3d 1348, 1356–57 (11th Cir. 2009) (affirming summary judgment because the opposing party failed to "set out specific facts showing there is a genuine issue for trial" (citing formerly numbered Rule 56(e)(2))); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment").  And on appeal, Global continues to view the 2004 Agreement as unambiguous. (*E.g.*, Global Br. 17 ███████████████

████████████████████████████████████████████

█████████.)

In arguing ambiguity in the alternative, Global asserts that "[o]ne of the disputed facts precluding summary judgment" is ████████████████████

████████████████████████████████████████████

██████████████████████████ But the mere existence of a dispute about the meaning of a contract's express language is not a "disputed fact"

- 45 -

and does not authorize the introduction of extrinsic evidence to interpret the contract. Where, as here, a contract is unambiguous, it is interpreted according to its plain language. *See Green v. Life & Health Ins. of Am.*, 704 So. 2d 1386, 1391 (Fla. 1998) ("contract language that is unambiguous on its face must be given its plain meaning").

In any event, whatever extrinsic evidence Global might wish to put forward would not change the outcome. As explained in Section II.B, extrinsic evidence about Global's and DIRECTV's intent is "irrelevant" because "[t]he only issue relevant to patent exhaustion is whether [the covenantee's] sales were authorized," not whether the patentee and the covenantee meant to protect downstream purchasers. *TransCore*, 563 F.3d at 1277. Global does not need another chance to introduce irrelevant evidence.

There is no disputed fact precluding summary judgment.

## <u>CONCLUSION</u>

The judgment of the district court should be affirmed.

Dated:  January 9, 2013

Respectfully submitted,


/s/ Gregory A. Castanias

GREGORY A. CASTANIAS
JENNIFER L. SWIZE
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
(202) 879-3939

LOUIS TOUTON
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA  90071
(213) 489-3939

*Attorneys for Defendants-Appellees*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 9, 2013, the foregoing NON-

CONFIDENTIAL BRIEF OF DEFENDANTS/APPELLEES was filed on the

CM/ECF system, which constitutes service of the document on the following

principal attorney:

> J. Wiley Horton, Esq.
> Pennington, Moore, Wilkinson, Bell & Dunbar, P.A.
> 215 S. Monroe Street, 2nd Floor
> Tallahassee, Florida 32301
> wiley@penningtonlaw.com
> *Counsel for Plaintiff-Appellant Global Communications, Inc.*

> <u>/s/ Jennifer L. Swize</u>
> Jennifer L. Swize
> *Attorney for Defendants-Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because it contains 10,858 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman 14 point font.

Dated:  January 9, 2013

/s/ Jennifer L. Swize
Jennifer L. Swize
*Attorney for Defendants-Appellees*